1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LERON WILLIAMS,                          CASE NO. CV F 08-01586 LJO BAK HC

12                     Petitioner,            **ORDER DENYING PETITION FOR WRIT
                                              OF HABEAS CORPUS WITH
13         vs.                                PREJUDICE; DIRECTING CLERK OF
                                              COURT TO ENTER JUDGMENT FOR
14   M. S. EVANS,                             RESPONDENT; DECLINING ISSUANCE
                                              OF CERTIFICATE OF APPEALABILITY
15                     Respondent.
16   _____/

17
            On August 29, 2008, Leron Williams ("Petitioner"), a *pro se* California prisoner, filed a Petition
18
     for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition").[1]  On
19
     January 26, 2009, M. S. Evans ("Respondent") filed an Answer to the Petition.  On February 2, 2009,
20
     Respondent filed an Amended Answer to the Petition.  As of the date of this Order, Petitioner has not
21
     filed a Traverse or an extension of time to do so.  Thus, this matter is ready for decision.
22
                                      **PROCEDURAL HISTORY**
23
            On February 3, 2006, a Fresno County Superior Court jury convicted Petitioner of first degree
24
     murder (Cal. Penal Code § 187(a)) and attempted premeditated and deliberate murder (*id.* §§ 187(a),
25
     664).  (2 Clerk's Tr. ("CT") 386, 388, 456.)  The jury found that a "principal" intentionally and
26

27   _____

28         [1]      Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
     the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

                                              1

personally discharged a firearm causing great bodily injury or death in the commission of the charged crimes (Cal. Penal Code § 12022.53(d), (e)), and that the charged offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members (*id.* § 186.22(b)(1)). (2 CT 386-89, 456.) On June 16, 2006, the superior court sentenced Petitioner to fifty years to life in state prison. (*Id.* 456.)[2]

On August 11, 2006, Petitioner appealed his conviction and sentence to the California Court of Appeal. (2 CT 458.) On June 19, 2007, the court of appeal affirmed the conviction and sentence in a reasoned opinion. (Lodged Doc. ("LD") 7.) On July 27, 2007, Petitioner filed a petition for review in the California Supreme Court, which summarily denied the petition on August 29, 2007. (LD 8-9.)

On July 15, 2008, Petitioner filed a habeas petition in the California Court of Appeal, which denied the petition on July 31, 2008, on procedural grounds.[3] On August 29, 2008, Petitioner filed his federal Petition. On October 14, 2008, Petitioner filed a habeas petition in the California Supreme Court, which summarily denied the petition on April 1, 2009. *See* California Appellate Courts, http://appellatecases.courtinfo.ca.gov (last visited May 26, 2009).

## **FACTUAL BACKGROUND**[4]

On the afternoon of October 9, 2004, family and friends gathered for a barbecue in the front yard of Johnnie Mae Carter's house on South Bardell in Fresno. They were celebrating the recent release from prison of Ms. Carter's two sons, Michael McGhee and Anthony Beard. Ms. Carter's daughter, Chermane Nutt, lived at the house and was present for the party, along with numerous cousins, nieces, and nephews.

---

[2] Petitioner was jointly tried with co-defendant Shannon Shamar Senegal for the same counts as discussed *supra*. (Lodged Doc. 7 at 2.) Senegal was also found guilty of first degree murder and attempted premeditated and deliberate murder, with the firearm and gang enhancements found true. (*Id.*)

[3] The Court takes judicial notice of the state appellate court records for Petitioner's case, which are available on the Internet at http://appellatecases.courtinfo.ca.gov. *See Smith v. Duncan*, 297 F.3d 809, 815 (9th Cir. 2002). In denying Petitioner's habeas petition on procedural grounds, the court of appeal stated: "The petition is conclusional, raises some issues that were rejected on appeal, raises issues that could have been, but were not, raised on appeal, and raises a sufficiency of evidence claim that is not cognizable in a habeas corpus proceeding." *See* California Appellate Courts, http://appellatecases.courtinfo.ca.gov (last visited May 26, 2009).

[4] Because Petitioner challenges the sufficiency of the evidence, the Court has reviewed, independently, the state court record. *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997). Based on this review, the Court adopts the factual background from the June 19, 2007, California Court of Appeal opinion on direct review as a fair and accurate summary of the evidence presented at trial. *See id.*; *see also* 28 U.S.C. § 2254(d)(2), (e)(1).

Beard was associated with a prison gang, known as "Kumi/415," and family members were associated with the local "U-Boys" gang. The Weller Street Boys was a rival gang to the U-Boys, with their turf located just one street away from South Bardell.

Just as Beard arrived at his mother's house, Trinell "Petee" Beasley drove up in his black Mustang and stopped in front of Ms. Carter's house. Petee remained in his car but greeted Beard and said, "oh, look who they let out. They let you out." Petee and Beard briefly talked, and then Petee drove away. At about the same time, Ms. Nutt left the house and went to her son's high school to deliver his football cleats, and then returned to the house and rejoined the barbecue.

Beard and McGhee visited with the other guests in their mother's front yard. About 10 to 15 minutes after Petee left, Beard's cousin asked if he knew some guys on the street. Beard had been leaning against a car, with his back to the street. He turned around and saw three men standing south of the house, on the corner of South Bardell and Belgravia. The men were wearing sweatshirts with the hoods on their heads, and they were walking toward the house at a regular pace. Beard turned away and resumed visiting with his family.

Less than one minute later, the three men arrived at Ms. Carter's front gate. Two men were wearing black sweatshirts, and one man was wearing a red sweatshirt. The men pulled guns and fired at the group in the front yard, and Beard's cousin shouted for everyone to get down. Beard was still leaning against the car, with his side to the front gate. He turned around and saw the three men firing their weapons. They were standing side-by-side and did not say anything as they fired. Beard fell to the ground and tried to take cover. Michael McGhee, Beard's brother, grabbed his neck and also fell to the ground. The three gunmen fired "lot[s] of shots" and fled on foot.

Beard's mother and sister were inside the house when the shooting occurred. They thought they heard firecrackers and ran outside. The young nieces and nephews were running and screaming. Ms. Carter ran to Beard's side, and Beard said he was hit and he was worried about his brother, McGhee.

Beard suffered gunshot wounds in his right side, left thigh, and the right shin below the knee. Beard was taken to University Medical Center and treated for his wounds. Beard's brother, Michael McGhee, suffered multiple gunshot wounds to his chest and neck, and died that day from his wounds.

The police found numerous shell casings at the scene of the shooting, consisting of nine millimeter and .45-caliber ammunition, indicating at least two different weapons were used. Based on the location of the casings, the shots were fired either from the sidewalk or the street, toward the house. The police served search warrants on several individuals associated with the Weller Gang and recovered numerous weapons, but the guns used in the shooting were never located.

**The Initial Investigation**

Fresno Police Detective Richard Byrd arrived at Ms. Carter's house just after the shooting and started the investigation by interviewing Ms. Carter. Ms. Carter stated that after the shooting, Beard told her that Shannon Senegal was one of the gunmen.

Later on the night of the shooting, Detective Byrd interviewed Beard in the emergency room at University Medical Center. Beard was on a gurney and being treated for his wounds. He was a little groggy but able to respond to Byrd's questions. Beard told Byrd that Senegal was the gunman in the red sweatshirt, he did not know who the other two gunmen were, but he thought he could probably identify them from photographs. Beard also said he could not tell who actually fired the guns, but he was adamant that Senegal was there.

On October 10, 2004, the day after the shooting, Detective Byrd again interviewed Beard at the hospital. Beard was more alert than the previous day. He said he saw Senegal pull a gun, but did not know who the other two gunmen were.

On October 28, 2004, Detective Byrd interviewed Beard at the police department. Beard admitted being a drug user but denied membership or association with any gang. Beard admitted members of his family were members of the U-Boy gang. Byrd showed

3

Beard seven different photographic lineups. Beard identified Senegal as a gunman, and said he looked directly at Senegal. Byrd testified that Beard never wavered in his identification of Senegal.

Detective Byrd had received information that one of the Thomas twins, either Adavier or Atavier, might have been one of the gunmen. Byrd determined that Adavier was in custody on the day of the shooting, so he included Atavier's photograph in the lineups. Beard selected Atavier's photograph as a Weller gang member. As their conversation continued, Beard said he heard one of the Thomas twins was present at the shooting, but he could not distinguish between the twins and said he never actually saw one of the twins at the scene.[5]

Detective Byrd continued to show Beard the photographic lineups. Beard identified Leron "Get Low" Williams [(Petitioner)] as being with Senegal during the shooting and said he was "positive" [Petitioner] was there, [Petitioner] was one of them "for sure," but he was not sure if [Petitioner] had a gun. This was the first time that Beard said [Petitioner] was involved. Beard said he knew [Petitioner] because he used to buy drugs from him. Detective Byrd asked why Beard failed to previously mention [Petitioner]. Beard replied that he heard rumors on the street that "Get Low" was involved, and after hearing these rumors "it all registered to me" that [Petitioner] was there. Beard also told Detective Byrd that he did not want to testify because he was afraid of what might happen to him and his family. "And he kind of put it in the terms of, you know, the gang thing."

Detective Byrd testified Beard recognized some of the other individuals in the photographic lineups as being associated with the Weller Street area, but Beard said those particular individuals were not involved in the shooting.

**Ms. Nutt's First Statement**

On either November 2, 2004 or December 2, 2004, Detective Byrd conducted a tape-recorded interview with the victims' sister, Chermane Nutt. Ms. Nutt stated that prior to the shooting, "Petee" arrived at Ms. Carter's house in his black Ford Mustang and briefly spoke to Beard. Ms. Nutt stated Petee drove away, and she left the barbecue and took her son's cleats to the high school. As she returned to her mother's house, she noticed Petee's black car was stopped next to a small brown car on a nearby street, and the occupants of the two vehicles were talking to each other. Ms. Nutt stated there were four people in the small brown car: the driver was [Petitioner]; the passengers were Shannon Senegal; one of the Thomas twins (either Adavier or Atavier), but she could not tell them apart; and an unknown male.

Ms. Nutt stated she returned to her mother's house, and the shots were fired two or three minutes later. Ms. Nutt said she ran out of the house but did not see the gunmen and only saw "arms and legs running away." Ms. Nutt tried to help Beard, and Beard said that Senegal was one of the gunmen.

**Ms. Nutt's Subsequent Statement**

As the investigation continued, Detective Byrd was informed that Ms. Nutt might have held back information about the shooting in her previous interview. During the preliminary hearing, Detective Byrd observed people arguing and fighting by the elevators and in the hallway outside the courtroom. Ms. Nutt attended the preliminary hearing.

On June 2, 2005, after the preliminary hearing, Detective Byrd interviewed Ms. Nutt, and she disclosed additional details. Detective Byrd testified that Ms. Nutt again stated she left her mother's house and went to her son's high school to drop off his cleats. As she returned to her mother's house, she saw "Petee's" car stopped next to a brown car, and the occupants of the brown car were Senegal, [Petitioner], one of the Thomas twins, and an unknown person. In this interview, however, Ms. Nutt stated that Beard

---

[5]     [California Court of Appeal footnote 4:] Atavier Thomas, a member of the Weller Boys, was subsequently murdered in 2005.

4

arrived at the barbecue after she returned home from her son's high school.

In addition, Ms. Nutt stated that after she returned to her mother's house, she was standing on the front porch and saw four or five individuals at the corner of Florence and South Bardell. They were walking on South Bardell toward the house and the next street, Belgravia. She recognized them as the same individuals who had been in the small brown car and talking to Petee: Senegal, [Petitioner], and one of the Thomas twins. Ms. Nutt stated that she had seen these men in the neighborhood on prior occasions so their presence was not unusual, and she went inside the house. Within 30 seconds, she heard the sound of firecrackers, which were the gunshots.

Detective Byrd testified Ms. Nutt's husband was present during this interview. Detective Byrd asked Ms. Nutt why she previously failed to disclose this information. Ms. Nutt replied that she did not want to get involved or testify in the case, and thought that Beard could be the person who talked to the police. Ms. Nutt stated she did not want to get involved "because of being threatened. She was already being threatened," and she was afraid for her family. Ms. Nutt's husband asked whether they could enter the witness protection program.

As a result of Ms. Nutt's fears and her husband's request, Detective Byrd arranged for her to enter the district attorney's witness relocation program. It was stipulated that the witness relocation program paid the participant's relocation expenses, including the first three months of rent.

**[Petitioner]'s Postarrest Statement**

On March 9, 2005, [Petitioner] was arrested at his house; Monique Thomas was present when he was arrested. [Petitioner] did not resist and no weapons were found in his house. Detective Byrd interviewed [Petitioner] that day, after advising and obtaining a waiver of the rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[Petitioner] denied current gang membership, and said he had been part of the Six Deuce Diamonds, a Crips gang, when he was in high school, about 10 years ago. The Six Deuce group was associated with the 107 Hoovers. [Petitioner] stated that some of his associates from those gangs were now members of rival groups, including the U-Boys. [Petitioner] insisted that former Bloods and Crips were able to hang out together without any problems, and the gangs were now associated with the streets.

[Petitioner] said he hung around Weller Street because that is where "I get my haircut." He did not believe his family claimed any type of gang. [Petitioner] said Weller was "a cool street" because girls were there, only kids hung around there, these people did not wear gang colors, and it was not gang turf. He was not aware of any gang problems on Weller Street. [Petitioner] said he did not know why people called him "Get Low," and it might have been from dancing at a club. [Petitioner] had numerous tattoos with the names of his girlfriends.

[Petitioner] said Senegal and Petee were related to him, and he knew the Thomas twins. [Petitioner] said he only knew Beard and McGhee because he heard about the shooting, but he did not otherwise know them. [Petitioner] heard from a "smoker dude" that "some Asians" were responsible for the shooting because they had conflicts with "some black people." [Petitioner] said he had a "brownish gold" car, but he was not with Senegal and one of the Thomas twins on the day of the shooting, and he did not recall pulling up to Petee's black car and talking to him. [Petitioner] could have been on Weller Street that day for a haircut.

Detective Byrd advised [Petitioner] that witnesses said he was with Senegal, and they walked up to the South Bardell house and started shooting. [Petitioner] said they had the wrong guy. Byrd asked why people would identify [Petitioner] if he was not there. [Petitioner] again said he had nothing to do with the shooting, but "I was probably in the area. I know that's grooming night." [Petitioner] was not sure if he heard the gunshots because "I hear shots around there all the time. Damn near every time I go get a haircut you hear some shots around here."

"[Q] You would have heard these [shots] because these people put you

5

standing right in the group of people that were shooting.

"[A] Uh, nah, it couldn't have been me."

[Petitioner] again insisted he was not involved with any gangs or the shooting.

**Trial Testimony**

At trial, Beard admitted he suffered numerous prior convictions, including burglary in 1990, walking away from custody in 1991, misdemeanor giving a false name to an officer in 1992, and second degree burglary, stealing a car, and spousal abuse in 1999. Beard admitted he used cocaine, but testified he did not drink or use drugs on the day of the shooting. Beard admitted being part of the Kumi/415 prison gang, but denied being a member of the U-Boy gang.

Beard testified [Petitioner], Senegal, and another person walked up to the house. All three men pulled guns and started shooting. Beard testified he was certain of his identification of [Petitioner] and Senegal. Beard testified he turned and looked at the three men for about five seconds, when they were at the front gate, before the shooting started. Beard tried to hide behind a car but he was wounded. Beard testified that as he was being lifted into the ambulance, his mother and sister asked if he saw who did it, and Beard replied it was Senegal.[6]

Beard testified he knew [Petitioner] as a drug dealer on Weller Street, because Beard purchased drugs from him on numerous occasions. Beard had known Senegal for many years, and knew Senegal was a member of the Weller gang. Beard testified there was a third gunmen, but he did not know that person.

Beard testified that he spoke to Detective Byrd at the hospital, just a few hours after the shooting, and he told Byrd that Senegal was involved. He spoke to Byrd at the hospital the day after the shooting, and again said that Senegal was involved. Beard spoke to Byrd on a third occasion, at the police department, but denied that he made identifications simply based on hearing rumors from family and friends. During this interview, Beard told Byrd that he was able to put a name to one of the other people at his house, and it was [Petitioner]. Beard testified it took him a while to figure out the names because the shooting happened so fast.

On cross-examination, however, Beard admitted his family told him that "Get Low" was involved.

"Q Up until the point when you heard from your family members that 'Get Low' was involved, the fact that he was involved never crossed your mind; is that correct?

"A Not at the time, no."

Beard also admitted he purchased drugs from [Petitioner] on numerous occasions and knew what he looked like, but he did not identify him to Detective Byrd until his third interview, after his family talked to him about the case.

Beard testified he selected one of the Thomas twins from the photographic lineup, advised Detective Byrd that family members told him that one of the twins might have been involved, and also told Byrd that he now remembered that one of the twins was there. Beard admitted he already knew the twins pretty well before the shooting, because they spent time in the neighborhood and he saw them on Weller Street. Beard also admitted that he never mentioned the twins during his first and second interviews with Detective Byrd, and that he was not certain they were there "other than what I was told."

Ms. Nutt testified that Petee drove up to her mother's house, briefly spoke to Beard, and drove away. Ms. Nutt also saw Petee talking to some people in a car, but she could not identify the occupants and did not know whether [Petitioner] and Senegal were

---

    6    On cross-examination, Beard testified he never talked to his mother at the house after he was shot, and they talked about the incident the day after the shooting.

6

in the car. When Ms. Nutt returned to the house, she was standing in the front yard for a while, and saw four or more people walking toward the house. Ms. Nutt testified she could not "visualize" who was walking toward the house. Ms. Nutt went inside and was talking to her mother when she heard the gunshots. She ran outside to protect her young child, and saw her brothers on the ground. Ms. Nutt testified she saw the backs of four people as they ran away and never saw their faces. Ms. Nutt testified that before Beard was placed in an ambulance, he said he knew who it was but did not disclose a name.

Ms. Nutt testified that she recalled being interviewed by Detective Byrd and said [Petitioner] could have been one of the people talking to Petee, and she could have said that one of the Thomas twins were there. Ms. Nutt could not recall her statements to Detective Byrd during her two interviews, but testified her memory was more accurate during the interviews than at trial. Ms. Nutt explained her second statement was more accurate than her first statement because she "didn't want to be involved in it" when she was interviewed the first time. Ms. Nutt testified she was aware of gang activity in the neighborhood between the U-Boys and the Weller gang. She was also aware of the possible consequences against someone who testified in a murder trial against Weller gang members, that "they'll take off whoever that goes and testify," but that did not matter to her.

## Testimony of Gang Expert

Detective Ron Flowers testified as the prosecution's gang expert. He had been a member of the Fresno Police Department for seven years. He previously served as a patrol officer in southwest Fresno, where gang activity was prevalent. He had been assigned to the Multi-Agency Gang Enforcement Consortium (MAGEC) for the past three years, and dedicated 60 to 70 percent of his time to investigating gang activity in southwest Fresno, particularly African-American gangs. He had approximately 500 contacts with gang members as a patrol officer, and another 150 to 200 contacts as a detective with MAGEC.

Detective Flowers testified his work with MAGEC included validation of gang members, and explained that in California, a person "has to meet certain criteria set forth by the state." The state uses 10 validation criteria elements, and Fresno County uses three factors to validate a person as an active gang member, and two factors to validate an associate. These validation factors include whether a person is associating with other gang members or associates, arrested with gang members, has gang tattoos, wears gang clothing, is depicted in photographs with other gang members or displaying gang hand signs, or identified through graffiti or gang monikers. Validation may also occur through a reliable source, such as the Department of Corrections, the Fresno County Jail, or the probation department.

Flowers testified the African-American gangs in southwest Fresno were primarily territorial, with their turf and names based on streets and neighborhoods. There were two large rival gang alliances in southwest Fresno: TWAMP and MUG. Each organization consisted of numerous street gangs which had formed alliances for various reasons, including increasing their strength, thwarting law enforcement, and increasing opportunities for narcotics sales and distribution.

Flowers testified that nearly every street or neighborhood gang in southwest Fresno was aligned with either TWAMP or MUG. These subset gangs were named for their streets. A gang member aligned with MUG would not be spending a lot of time in an area controlled by a gang aligned with TWAMP.

Flowers testified that TWAMP consisted of the following street gangs: Villa Posse, Lee Street, Weller Boys, Lotus Street, Grove Street Posse, Strother Boys, Villain Blood, Young Black Soldiers, and Four Trey (which is primarily a prison gang). Villa Posse was a large group and a widespread gang in Fresno. Villa Posse was considered the parent gang of Weller Boys, Fig Boys, Lotus, and Grove Street Posse. Villa Posse controlled various areas through the smaller hood or street gangs.

The Weller Boys were in close alliance with Villa Posse, and recognized as a "street or a hood" of the much larger Villa Posse parent gang. The Weller Boys consisted

7

of 23 members, the turf was the 2300 block of South Weller, and a member may identify himself as a Weller Fig or Fig Boy. The Fig Boys were also synonymous with the Weller Boys. Martin Luther King Avenue used to be known as Fig Street, and one street gang was still known as the Fig Boys.

> "Q A Fig Boy ... if that person was living or spending the bulk of their time currently in Weller Street—2300 block of Weller Street, would that person be considered Weller Boy just based on the location and their association with Fig Boy in the past?
> "A Again, it's synonymous with what you had during that time. You had childhood friends on two opposite streets on the same block in the same area who grew up together, who identified themselves in a certain fashion, but pretty much did everything together consistently. In some cases you'll have a Weller Boy identify himself as Weller Fig or Fig Boy and vice versa."

Flowers explained that MUG was the rival gang alliance to TWAMP. MUG was an acronym for the individual street gangs called Modoc, U-Boys, and Garrett Street. Modoc was first recognized in 1989, it was a "stand alone gang," and evolved from Fink White Deuce. The U-Boys stood for "U for Eugenia" Street. The Dog Pound was a "stand alone" gang named for the area itself, and had recently joined with MUG. Another "stand alone" gang in the area was the Muhammads, also known as Walnut Street Possee or Walnut Street Crips. The Sampsons had converged with MUG, but had slowly been displaced. The gangs which aligned with MUG did so for strength, the ability to gain weapons, and narcotics transactions.

The primary activities of both the U-Boys and the Weller Boys were narcotics sales, along with guns and other violent activities. "The sales of narcotics and guns and violence go hand in hand." The neighborhood areas were so small that it was common for members of the rival groups "to cross each other's paths while in transit, to be attacked while they are out distributing or selling their narcotics." A member of the U-Boys would not be allowed to sell drugs on the turf of the Weller Boys, and some type of violent assault would occur to halt such drugs sales. Flowers testified it was "[s]lightly possible" for an individual to sell drugs out of a relative's house on the Weller Boys' turf, without being part of the Weller Boys, but the gang would probably become suspicious because of the traffic in and out of the house, and that dealer would be forced to leave the area through violence.

Detective Flowers testified that in the six months prior to October 2004, the rivalry between TWAMP and MUG was exacerbated by "at least two significant homicides," of Hammod Demmery, a validated member of Modoc, and Darrell Hilliard, a member of Strother. Flowers explained that it would be expected that TWAMP would retaliate against MUG for a homicide of one of its members. If a gang failed to retaliate, it would be a sign of weakness, the gang's established notoriety may decrease, it may be considered a weaker group, and other groups may attack them.

Flowers testified Senegal was a validated member of "Weller VP, which is an acronym for Villa Posse," and part of TWAMP. Senegal had been a validated Weller VP since 1996. Flowers had been aware of Senegal's presence in Fresno during his patrol work in 2000 or 2001, and personally observed him associating with members of the Fig Boys. When Senegal was arrested in this case, he identified himself as Villa Posse, and he had a "West Side Fig" tattoo on his arm.

As to [Petitioner], Flowers testified he had "a difficult time trying to establish his hood," but determined [Petitioner] was a member of "Weller VP, Villa Posse," based on the totality of the circumstances. After he reviewed [Petitioner]'s background, Flowers "thought it was pretty easy" to conclude [Petitioner] was a member of Weller VP. Flowers started with an "old picture" of [Petitioner], which gave him "a clear indication of ... at least foundation to who he belonged with. And I used that to establish not only

the group but the associates and the current arrests that has been made or was made." In April 2005, [Petitioner] admitted his affiliation with Villa Posse when he was arrested and booked into jail in this case. On cross-examination, Flowers clarified that [Petitioner]'s self-admission was "not one of the reasons I validate him. That was one of the criteria I used for the validation."

Flowers testified [Petitioner] associated with other Weller Boys, and allegedly committed the instant offense along with other Weller Boys. Senegal, [Petitioner], and Trinell "Petee" Beasley were present at the funeral of Darrell Hilliard, a Strother Boy/TWAMP.[7] Flowers testified that Adavier Thomas was a member of Fig Weller VP, and Atavier Thomas was a member of the Weller Street gang.

Flowers testified about several photographs introduced by the prosecution, which depicted Senegal throwing gang hand signs; [Petitioner], Senegal, and Senegal's brother wearing red jerseys, which was the "color of choice for most members of Villa Posse or Villain Bloods"; [Petitioner] and Senegal with a validated member of YBS, a TWAMP gang; and [Petitioner] and Senegal with members of Lee Street, another TWAMP gang. Flowers was not aware whether [Petitioner] had any gang tattoos.

On cross-examination, Flowers was asked to explain his testimony, that another factor used to validate [Petitioner] as an active member of the Weller gang, was because he was arrested with other known gang members.

> "Q In fact, isn't it true, Detective, that [Petitioner] was arrested in his own home with his girlfriend, and those were the only two people present at the time he was arrested?
> "A Well, we're talking about a specific crime that had an ongoing investigation, obviously. And over time, once it was determined that [Petitioner] was a suspect, he was, in fact, arrested for that case that involved other members of that same group."

Flowers conceded [Petitioner] was at home with his girlfriend when he was arrested, and no other gang members were present at that time.

> "Q So what you are really saying is that suspected or rumored to be involved in a gang crime and then arrested for that is the same thing as being arrested with other gang members? Is that what you are saying?
> "A Correct.
> "Q So the mere fact that [Petitioner] is suspected of being involved in a crime that you suspect to be gang related and is later arrested for that case is a validation criteria in your opinion?
> "A I know [Petitioner] was arrested for his part in a crime that involved other gang members. [Petitioner] was arrested with other gang members.
> "Q For his part in the crime that we're right here determining whether or not he's guilty of, right?
> "A Right."

Also on cross-examination, Flowers conceded it was possible that an individual booked for a gang-related crime, who might not be a gang member, could claim gang membership for protection while in custody. However, Flowers believed the gang might assault that individual if the false membership claim brought undue attention to that gang from law enforcement officials investigating that offense. It would be "very unhealthy" for someone to claim gang membership if that person has not been accepted as a

---

7    Flowers conceded that [Petitioner]'s presence at that funeral was not contained in a report about the service, but testified Detectives Yee, Federico, and Gates attended the funeral for surveillance purposes and to provide security for the family members, and observed [Petitioner] there.

9

member.

Detective Flowers testified that red was the predominant color of the Villa Posse gang. He admitted [Petitioner] was wearing blue when he was arrested, the U-Boys predominantly wore blue, and blue was the chosen color of the Crips. Flowers explained color distinctions among TWAMP and MUG:

"... I want everyone to keep in mind here in Fresno there is no color dispute. There is no barriers. You'll have a gang with Crips and Bloods within it. Like in this case Villa Posse is a great example."

Flowers cautioned that "[y]ou have to be careful" not to assume particular clothing is gang-related simply because of the color. Flowers testified the U-Boys wore both red and blue, blue was not a particular factor in Fresno gangs, and the "totality of [the] circumstances" may give some direction on the individual's status aside from colors.

Flowers testified that [Petitioner] admitted membership in the Six Deuce Diamond Crips in 1994, but that gang was synonymous with Villa Posse.

"Q Aren't there Six Deuce Diamond or former Six Deuce Diamond Crips in the TWAMP side of things and the MUG side of things?

"A Yes.

"Q So Six Deuce and Villa Posse can be the same thing, but they are not necessarily the same thing?

"A Well, again, the term Six Deuce, 107, Hoover Crip, Pyru Blood, these are usually picked up in certain facilities. Six Deuce Diamond Crips predominantly take on that gang affiliation while incarcerated in the California Youth Authority. Again, once they come out they gravitate back to their street or their hood. They are accepted, obviously, because of who they are or where they are from. But they still carry that Six Deuce Diamond, the 107, the Hoover Crip, Pyru Blood and so forth.

"Q Because that's what they claim on the inside?

"A The inside and outside. Some folks don't make it there, but they do accept it because who they closely associate with. They want to mimic that individual. They want to be like that person. Various reasons."

On further cross-examination, Flowers testified another gang investigator established [Petitioner] was a gang member in 1999.

"Q What about within the last three years?

"A Reliable sources.

"Q No. Any other detective in your unit?

"A I think detectives I'm going to mention knew of [Petitioner's] status from those facts established by [Detectives] Duane Freeman and Marcus Gray. [¶] ... [¶]

"Q So within the last three years and not talking about what may have been the case in 1999, are you aware of other reliable sources that have identified [Petitioner] as a gang member?

"A Yes.

"Q And those would constitute, essentially, other gang members, correct?

"A Um, in one case yes. But the reason I identified those subjects or those persons as a reliable source without a name is because during that time—during the course of this investigation I had—didn't have the opportunity to actually speak with them. That information was provided to detectives—homicide detectives who were working the case and who had a specific detail and provided limited information to other detectives such as myself. So for their protection I described him as reliable sources.

10

"Q Those other individuals who identified [Petitioner] as a gang member were themselves, in fact, members of the U-Boy gang, correct?

"A One individual. And I believe there were two or three witnesses in that area involved in this case that are—or were familiar with his status as a member of Weller, yes."

Flowers conceded gang members were not always reliable sources.

The prosecution introduced documentary evidence of prior offenses committed by gangs within the TWAMP alliance. Flowers testified that Jermaine Levey, a validated member of Villa Posse, was convicted of assault with a deadly weapon (§ 245, subd. (a)(1)); and Adavier Thomas, a validated member of Fig Weller VP, was convicted of shooting someone (§ 245, subd. (a)(2)). Flowers testified the victims in this case—Michael McGhee and Anthony Beard—were validated members of the U-Boys. As to the instant case, Flowers testified the murder and attempted murder of rival gang members would constitute predicate offenses.

The prosecutor set forth a hypothetical based upon the facts of this case, where validated members of the Weller Boys walk up to a gathering of U-Boys and start shooting without saying anything, and whether that act would have been designed to benefit or assist that particular gang. Detective Flowers testified such an assault would continue the established rivalry but, more importantly, improve the respect and reputation of the gang. "That's the key thing that's important to a gang. If reputation, respect that's compromised, retaliation is almost immediate." Detective Flowers's opinion would be bolstered if the victims were U-Boys, and part of a larger group of U-Boys. It would be "unusual for such a large gathering of rivals to place themselves in such a dangerous position. It's probably advantageous for the rival group to take advantage of that opportunity when so many members are present. You know, a greater number of victims would fall and further bolster the establish[ed] notoriety that the gang has had for so many years."

The prosecutor asked another hypothetical, where two members of the Weller Gang, such as [Petitioner] and Senegal, were part of the group that walked up and opened fire on a gathering of U-Boys, including McGhee and Beard, whether they would have been acting to benefit the Weller gang. Flowers replied that in such a situation, the shooters' individual status would grow, and the gang's shared status would be far extended. "It would send a clear message to rivals that they are a force to be reckoned with." The gang would also retaliate against any gang member or family who cooperated with the police or testified in court, they would be called snitches, and they would place themselves in harm's way by cooperating, but Byrd explained some people cooperate because they have had enough of the gang lifestyle and culture.

**Defense Evidence**

Neither [Petitioner] nor Senegal testified. A defense investigator testified he interviewed Beard on May 21, 2005. Beard said he saw the gunmen for about three seconds, he paid the most attention to Senegal as he drew his weapon, and he heard rumors that [Petitioner] also was there. Beard said he was not able to identify [Petitioner] before he heard the rumors from his family, and he was about 70 percent sure of his identification of [Petitioner]. Beard said he was not involved in gang activity.

Cody Senegal, Shannon Senegal's wife, testified that she recalled the afternoon of October 9, 2004. She was at home with Senegal when she received a telephone call from a family member that there had been a shooting on South Bardell. Ms. Senegal and her husband walked around the corner to the scene. There were a lot of police there. They also met "a lot of ladies," including Chermane Nutt. Ms. Senegal testified the women were accusing "a lot of people out there, including Shannon." Ms. Senegal tried to explain he was with her during the shooting. Ms. Senegal denied testifying for other family members in unrelated trials.

Dr. Robert Shomer, a psychologist, testified as an eyewitness identification expert. Dr. Shomer testified to his opinion that there is a distinct correlation between the

amount of detail a person can provide after an event, and the accuracy of any subsequent identification. Dr. Shomer explained the passage of time adversely affects the accuracy of a person's identification. There are other factors which diminish a witness's ability to accurately remember, including the presence of a weapon, which tends to cause people to focus on it. A witness's certainty of identification has no correlation to the accuracy of that identification. A person who identifies a stranger may become more confident of the identification over time, even as the memory diminishes.

[Petitioner] and Senegal were convicted of first degree murder of McGhee and attempted murder of Beard, with enhancements for firearm use and committing the offenses for the benefit of a criminal street gang. [Petitioner] and Senegal have filed separate appeals and have not joined in the issue(s) raised by the other party. On appeal, [Petitioner] contends there is insufficient evidence to support his convictions on the substantive offenses and the gang enhancements, and contends an officer's testimony as a gang expert abrogates basic principles of due process. [Petitioner] also raises several constitutional challenges to the gang enhancement, that it is void for vagueness and violates his First Amendment right to free association.

(LD 7 at 3-22.)

## PETITIONER'S CLAIMS

1.  Insufficient evidence supported Petitioner's murder and attempted murder convictions (Pet. 6);

2.  Insufficient evidence supported the gang enhancement on Petitioner's convictions (*id.*);

3.  Petitioner's First Amendment right of association was violated because the California Street Terrorism Enforcement and Prevention Act of 1988, 1988 Cal. Legis. Serv. 1242 (West) ("STEP Act"), punishes individuals for the unlawful acts of others (Pet. 7);

4.  Petitioner's due process rights were violated because the STEP Act encourages arbitrary and discriminatory enforcement (*id.*); and

5.  Petitioner's due process rights were violated when the prosecution used law enforcement officers as gang experts (*id.* 7a).

## STANDARD OF REVIEW

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

12

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

13

However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537 U.S. at 24-25, 27. An "unreasonable application" is different from an "erroneous" or "incorrect" one. *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*, 537 U.S. at 25.

A state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

# DISCUSSION

## Claim One

In his first claim, Petitioner alleges that insufficient evidence supported his murder and attempted murder convictions. (Pet. 6; Pet. Ex. 1.) Petitioner states that no one saw him with a gun or fire a gun at the victims, and that he was merely seen in the neighborhood where he lives walking toward a house where a crime subsequently occurred. (*Id.*) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). In rejecting Petitioner's claim, the court of appeal stated:

> [Petitioner] contends his convictions for first degree murder and attempted murder are not supported by substantial evidence, and challenges the reliability and veracity of the identifications of Beard and Ms. Nutt. We begin with the well-settled standards to assess the sufficiency of the evidence to sustain a criminal conviction. The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11; *People v. Earp* (1999) 20 Cal.4th 826, 887.) The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on "'isolated bits of evidence.'" (*People v. Johnson*, *supra*, 26 Cal.3d at p. 577; *People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.)
>
> Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid.*)

We apply the same standard to convictions based largely on circumstantial evidence. (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1745.) Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt. (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1329.) We do not reweigh evidence or redetermine issues of credibility. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931 (*Ferraez*).)

An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) It must not reweigh the evidence, reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 884.) Furthermore, an appellate court may reject the testimony of a witness who was apparently believed by the trier of fact only if that testimony is inherently improbable or impossible of belief. (*People v. Jackson* (1992) 10 Cal.App.4th 13, 21; *People v. Maxwell* (1979) 94 Cal.App.3d 562, 577.) An appellate court may not reverse a conviction for insufficiency of the evidence unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

[Petitioner] attacks Beard's identification testimony, that he was certain [Petitioner] was one of the gunmen, and contends Beard's trial testimony was not reasonable, credible, or of solid value because Beard admitted he only identified [Petitioner] after he heard rumors from family and friends about [Petitioner]'s alleged involvement. [Petitioner] also attacks Ms. Nutt's unsworn statements to Detective Byrd, that she saw [Petitioner] speaking to Petee and walking toward her mother's house just before the shooting, and asserts these unsworn statements are unreliable because they are "the same as rumors on the street the eyewitnesses claimed to have heard," and Ms. Nutt failed to testify to these statements when she appeared at trial, even though she had moved under the witness relocation program.

[Petitioner] correctly notes that Beard's pretrial statements and trial testimony lack certainty as to his identification of [Petitioner] as one of the gunmen. Moments after he was shot, Beard told either his mother or sister that Shannon Senegal was one of the gunmen. A few hours later, Detective Byrd interviewed Beard in the emergency room; Beard said that Senegal was one of the gunmen, he did not know the identities of the other gunmen, but he thought he could probably identify them from photographs. The day after the shooting, Byrd again interviewed Beard in the hospital, and Beard again said Senegal was there but he did not know who the other two gunmen were.

Over two weeks after the shooting, Detective Byrd showed Beard a series of photographic lineups. Beard again identified Senegal as one of the gunmen, and said he looked directly at Senegal. As the interview continued, Beard identified one of the Thomas twins as a member of the Weller gang, and said he heard one of the twins was present during the shooting, but he could not distinguish between them and never actually saw him there. Beard also identified [Petitioner] from a photographic lineup. Beard said he was "positive" [Petitioner] was with Senegal during the shooting, [Petitioner] was one of the them "for sure," but Beard was not sure if [Petitioner] had a gun. Detective Byrd asked why Beard failed to previously mention [Petitioner]. Beard replied that he heard rumors on the street that [Petitioner] was involved, and after hearing these rumors "it all registered to me" that [Petitioner] was there.

At trial, Beard testified he was positive that [Petitioner] was one of the gunmen, and explained it took him a while to figure out the names because the shooting happened so fast. On cross-examination, however, Beard admitted his family told him that [Petitioner] was involved, and he did not identify [Petitioner] until after his family talked to him about the case.

The instant case, however, involved far more than Beard's delayed identification of [Petitioner]. In her first interview with the police, Beard's sister, Ms. Nutt, placed [Petitioner] near her mother's house just before the shooting. Ms. Nutt told Detective Byrd that she saw "Petee" talking to some individuals in a small brown car, and the

occupants of that car were [Petitioner], Senegal, one of the Thomas twins, and an unknown male. In her second statement to the police, Ms. Nutt admitted she had additional information but explained she had already received threats against her family, and her husband asked about their family's possible placement in the witness relocation program. Ms. Nutt again stated that she saw [Petitioner], Senegal, one of the Thomas twins, and the unknown male in the brown car talking to Petee. She further disclosed that she was standing on the porch of her mother's house just before the shooting, as her brothers visited with the other family members at the barbecue. She saw four or five individuals walking on South Bardell toward their house, and she recognized them as the same individuals who had been in the small brown car and talking to Petee: [Petitioner], Senegal, and one of the Thomas twins. Ms. Nutt stated that she had seen these men in the neighborhood on prior occasions so their presence was not unusual, and she went inside the house. Within 30 seconds, she heard the sound of firecrackers, which were the gunshots.

There is thus substantial evidence, albeit circumstantial, that [Petitioner] and Senegal were among the gunmen in this case. From the moment of the shooting, Beard consistently said that Senegal was one of the gunmen, and he never wavered from that identification. Ms. Nutt was also consistent in saying that she saw [Petitioner], Senegal, and one of the Thomas twins speaking to Petee, very close to their house and just before the shooting. Ms. Nutt also said that she saw [Petitioner], Senegal, and one of the twins walking toward the house, she went inside, and she heard the gunshots about 30 seconds later. Such circumstantial evidence thus places [Petitioner] with Senegal just seconds before the shooting.

[Petitioner] makes much of the fact that Ms. Nutt failed to repeat these statements when she testified at trial, even though she had been placed in the witness relocation program. [Petitioner] also complains that Ms. Nutt may have simply repeated the rumors referred to by Beard. However, such circumstances are relevant to the witness's credibility rather than to whether there is substantial evidence to support the convictions. Moreover, Ms. Nutt did not disown her statements to Detective Byrd. At trial, she testified her memory was more accurate during her interviews with Byrd, and her second statement was more accurate than her first statement because she "didn't want to be involved in it" when Byrd interviewed her the first time. The jury was well aware of the timing and circumstances of Ms. Nutt's pretrial statements and capable of determining the credibility of her account.

As explained *ante*, this court may not reverse a conviction for insufficiency of the evidence unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.) Ms. Nutt's statements to Detective Byrd were not inherently improbable or impossible of belief, but instead presented credibility questions for the jury's resolution, and [Petitioner]'s convictions are supported by substantial evidence.

(LD 7 at 22-26.)

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Under *Jackson v. Virginia*, 443 U.S. 307 (1979), "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The Supreme Court has held that "the

relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Wright v. West*, 505 U.S. 277, 284 (1992). In addition, the AEDPA requires the federal court to "apply the standards of *Jackson* with an additional layer of deference," and ask "whether the decision of the California Court of Appeal reflected an 'unreasonable application' of *Jackson* and *Winship* to the facts of this case." *Juan H.*, 408 F.3d at 1274-75 & n.13. The California standard for determining the sufficiency of evidence to support a conviction is identical to the *Jackson* standard. *See People v. Johnson*, 26 Cal. 3d 557, 575-78 (1980).

The federal court must refer to the substantive elements of the criminal offense as defined by state law and look to state law to determine what evidence is necessary to convict on the crime charged. *Jackson*, 443 U.S. at 324 n.16; *Juan H.*, 408 F.3d at 1275. "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation and internal quotation marks omitted). When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the court must defer to that resolution. *Jackson*, 443 U.S. at 326. The trier of fact has the responsibility to determine the credibility of witness testimony shown to be inconsistent. *United States v. Ginn*, 87 F.3d 367, 369 (9th Cir. 1996).

The Court agrees with the court of appeal's analysis. Although Beard admitted he only identified Petitioner after he heard rumors from family and friends about Petitioner's alleged involvement, Ms. Nutt placed Petitioner near her mother's house just before the shooting. Ms. Nutt told Byrd that she saw "Petee" talking to individuals in a small brown car, and stated that those occupants were Petitioner, Senegal, one of the Thomas twins, and an unknown male. (2 Rep.'s Tr. ("RT") 321-22.) In her second statement to police, Ms. Nutt reiterated that she saw Petitioner, Senegal, one of the Thomas twins, and the unknown male in the brown car talking to Petee. (*Id.* 323.) Ms. Nutt then added that she was standing on the porch of her mother's house just before the shooting, and saw four or five individuals walking toward the house. (*Id.* 323-24.) Ms. Nutt recognized some of the individuals as the same ones who had been in the small brown car talking to Petee: Petitioner, Senegal, and one of the Thomas twins. (*Id.* 324.) Within twenty to thirty seconds, Ms. Nutt then heard the sound of firecrackers, which were

the gunshots. (*Id.*) This evidence placed Petitioner and his co-defendant Senegal at the scene just seconds before the shooting, and, coupled with Beard's firm identification of Senegal as a shooter, a rational trier of fact could determine from circumstantial evidence that Petitioner was also a shooter.[8] "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *See Walters*, 45 F.3d at 1358.

Viewing the evidence in the light most favorable to the prosecution and presuming the jury resolved all conflicting inferences from the evidence against Petitioner, the Court finds that a rational trier of fact could find the essential elements of the first degree murder of McGhee and the attempted premeditated and deliberate murder of Beard beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 326; *Walters*, 45 F.3d at 1358.

Accordingly, the Court finds that the California courts' rejection of Petitioner's insufficient evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

### Claim Two

In his second claim, Petitioner alleges insufficient evidence supported the gang enhancement on his convictions. (Pet. 6; Pet. Ex. 1.) Petitioner argues that the bases for the conclusions that he acted for the benefit of, at the direction of, or in association with any criminal street gang were speculative, conjectural, and otherwise failed to meet the threshold requirements of reliability required to find the enhancement true. (*Id.*) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst*, 501 U.S. at 803-05. In rejecting Petitioner's claim, the court of appeal stated:

> We now turn to [Petitioner]'s challenges to the sufficiency of the evidence of the gang enhancement. He contends the enhancements must be stricken for insufficient evidence, Detective Flowers's testimony was confusing and did not assist the jury, and Flowers's testimony was not credible, reasonable, or of solid value. . . .
> As with substantive offenses, the same substantial evidence standard applies when determining whether the evidence is sufficient to sustain a jury's finding on a gang

---

[8] As discussed in Claim Two, *infra*, other evidence that suggested that the shooting of Beard and McGhee was gang-related and that Petitioner was either a member of or affiliated with a rival gang, lends further support for the jury's finding.

enhancement. (*Duran*, *supra*, 97 Cal.App.4th at pp. 1456-1457; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322 (*Villalobos*).) The trier of fact may rely upon expert testimony about gang culture and habits to reach a finding on the gang allegation. (*Ferraez*, *supra*, 112 Cal .App.4th at pp. 930-931; *Frank S.*, *supra*, 141 Cal.App.4th at p. 1196.)

"A gang enhancement does not apply unless the crime was 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ....' (§ 186.22, subd. (b)(1).)" (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1197.) Gang membership alone cannot prove the requisite specific intent. (*Gardeley*, *supra*, 14 Cal.4th at pp. 623-624.) "As to the second prong of the enhancement, all that is required is a specific intent 'to promote, further, or assist in any criminal conduct by gang members.' (§ 186.22, subd. (b)(1).) Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*Villalobos*, *supra*, 145 Cal.App.4th at p. 322.)

In *People v. Morales*, *supra*, 112 Cal.App.4th 1176, the defendant and two fellow gang members committed a robbery. On appeal, the defendant argued that he lacked the requisite specific intent for the gang finding because the evidence showed only that the three men belonged to the same gang. *Morales* rejected that argument, and held there was sufficient evidence the defendant intended to commit the robbery in association with other gang members and that it was therefore "fairly inferable that he intended to assist criminal conduct by his fellow gang members." (*Id.* at p. 1198.)

There is clearly substantial evidence to support the jury's findings on the gang enhancements. As explained in section I, *ante*, Ms. Nutt stated that she saw [Petitioner], Senegal, and one of the Thomas twins in the brown car, and then saw them walking toward her house just seconds before she heard the shots. Beard consistently said that he saw three men walk up to the front of the house and start shooting, and Senegal was one of the gunmen. Based upon Detective Flowers's testimony, there is substantial evidence that [Petitioner] was a member of the Weller gang, based upon his self-admission at booking and his association with other members of the Weller VP gang. There is also substantial evidence that Senegal was a member of the Weller VP gang, similarly based on his self-admission and long-term association with other gang members. Detective Byrd determined that Adavier Thomas was in custody on the day of the shooting but Atavier was not in custody. Flowers testified that both Thomas twins were members of Weller VP. There was also substantial evidence that Beard, McGhee, and their family members were members of the rival U-Boys. While Beard denied his own membership, he admitted family members were associated with the U-Boys. Flowers testified that both Beard and McGhee were members of the U-Boys. The instant case thus involved at least three Weller VPs walking up to a large gathering of U-Boys, drawing weapons, and repeatedly firing into the group. Such an act was clearly done for the benefit of Weller VP.

[Petitioner] raises several challenges to the sufficiency of the evidence of the gang enhancements, and asserts Detective Flowers's testimony was confusing, internally inconsistent, and did not constitute evidence that was reasonable, credible, and of solid value to support the jury's findings. [Petitioner] particularly attacks Flowers's testimony about the TWAMP and MUG alliances, that he failed to explain the source for those acronyms, that it was not clear whether TWAMP and MUG were individual gangs with three or more persons, and the STEP Act only applies to gangs and not alliances. [Petitioner] complains that Flowers "made it impossible to determine accurately the names of the groups involved and to determine who belonged to which gangs," such that his testimony about the alliances was "inconsistent, leaving a *reasonable* trier of fact without a way to sort them out." (Italics in original.) In making this argument, [Petitioner] asserts Flowers's testimony did not make sense, and quotes several of

Flowers's statements out of context. [Petitioner] argues:

> "... Flowers testified 'Villa Posse, Lee Street, Weller Boys, which is synonymous with Fig, Lotus Street, Grove, the Strother Boys, Villain Blood—sometimes that synonymous with Villa Posse as well.' There are multiple ways to parse this statement; most of them don't make sense. Is Villa Posse, among other names, synonymous with Fig? Or is it synonymous with Fig, Lotus Street, Grove, the Strother Boys and Villian Blood? Or is it just that Weller Boys is synonymous with Fig and Villian Blood is sometimes synonymous with Villa Posse?"

[Petitioner] also complains the "confusion" from Flowers's testimony distracted the jury from the fact that the Weller Boys and U-Boys "lived in extreme proximity to one another" and frequently interacted.

> "... Because Flowers was unable to come up with a single example of any actual rivalry between Weller and U-Boys, it was necessary to concoct a rivalry between 'alliances' comprised of virtually every gang member in southwest Fresno."

[Petitioner] asserts there is no evidence whether gang members acknowledge the TWAMP and MUG alliances described by Flowers, or whether the acronyms were created by the police.

[Petitioner]'s arguments misrepresents the entirety of Flowers's testimony. As set forth *ante*, Flowers explained that the gangs in southwest Fresno are primarily named based on their neighborhood or street, and there were several street gangs which were synonymous or had merged with each other. For example, he explained that Martin Luther King Avenue was formerly named Fig Avenue, and the Fig Boys retained their name despite the street change. He also explained there was some overlap between the Fig Boys and the Weller Boys. More importantly, he explained that the Fig Boys and Weller Boys were smaller street gangs, and they were part of the larger Villa Posse gang, that other small street gangs were also part of Villa Posse, and members of those smaller gangs claimed allegiance to Villa Posse.

Flowers further explained the southwest Fresno neighborhood and street gangs had formed loose alliances and divided into rival groups known as TWAMP and MUG. He identified MUG as the Modoc, U-Boys, and Garrett Street gangs, whereas TWAMP consisted of Villa Posse, Weller Boys, Fig Boys, Lee Street, Strother Boys, and other smaller groups which were part of Villa Posse. Flowers explained the gangs formed these two rival alliances to increase their strength, thwart law enforcement, and increase their own narcotics activities.

[Petitioner] complains there is no evidence that TWAMP and MUG are separate gangs, or the nature of the relationship between TWAMP, MUG, Villa Posse, Weller, and U-Boys, such that Flowers could not rely on the activities of one gang and impute those activities to another gang. [Petitioner]'s arguments ignore the clarity of Flowers's testimony, in which he explained that the gangs in southwest Fresno are organized by neighborhood or street, and that these gangs have aligned into two rival groups, TWAMP and MUG. Flowers further explained that Weller was part of a larger parent gang, Villa Posse, and both Weller and Villa Posse were aligned with TWAMP, whereas the U-Boys were part of MUG. Flowers's testimony about parent and subset gangs, and the interrelated nature and rivalries within such groups, was clearly within the realm of admissible expert testimony for the jury's consideration. (*In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1001 ["[t]he association of multiple names with a gang satisfies the statute's requirement so long as at least one name is common to the gang's members"]; see, e.g., *In re Jaime P.* (2006) 40 Cal.4th 128, 131 [Calle San Marco gang as subset of both the Surenos and the Mexican Mafia]; *People v. Brown* (2003) 31 Cal.4th 518, 546,

fn. 10 [Fruit Town gang as a subset of the Bloods]; *People v. Loeun* (1997) 17 Cal.4th 1, 6, fn. 2 [Tiny Rascals as subset of Crip gang, Cambodians With Attitude]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1087 [Five Deuce Hoover Crips and Broadway Crips as subgroup of Crips; Van Ness Gangsters as subgroup of Bloods]; *In re I.M.* (2005) 125 Cal.App.4th 1195, 1201 [Mexican Locos as a subset of the Surenos]; *People v. Santos* (2007) 147 Cal.App.4th 965, 970 [crime committed by "'66,' a subset of East Coast Crips"]; *People v. Smart* (2006) 145 Cal.App.4th 1216 1221-1222 [case involving member of "Garden Block Crip (24th Street)," which consists "of the 29th, 24th and 21st Street subsets"].)

[Petitioner] asserts Flowers's testimony was inconsistent based on Beard's admission that he repeatedly bought drugs from [Petitioner], and that it defied possibility that a U-Boy would buy drugs from a Weller gang member. However, Flowers testified the street gangs aligned with TWAMP would not tolerate drug *sales* within in their neighborhoods by a member of a gang aligned with MUG. Flowers did not testify that a MUG could not *buy* drugs from a TWAMP. Moreover, Beard testified that he knew [Petitioner] from "Weller," implying that he might have gone into the Weller area to purchase drugs from him. Flowers never testified that the rival organizations prohibited rivals from purchasing drugs, only that violent consequences would occur if a gang tried to sell drugs on rival turf.

[Petitioner] points to Flowers's testimony about Six Deuce Diamonds as internally inconsistent with the rest of his testimony, because he said that gang existed within TWAMP and MUG and was a rival of itself. As set forth *ante*, however, Flowers explained that prison gangs follow the well known division between Crips and Bloods, and an inmate might claim the Crip gang of Six Deuce Diamonds, but the street gangs in southwest Fresno did not clearly fall within those rivalries, a gang member would return to his neighborhood or street gang upon his release from prison, and Villa Posse and Six Deuce Diamonds were examples of such situations.

[Petitioner] also attacks Flowers's testimony as internally inconsistent because he initially testified it was "difficult" to determine if [Petitioner] was a gang member, whereas he also testified it was "pretty easy" to determine he was a Weller boy, and that Flowers's testimony was based on unreliable statements from other gang members. The entirety of Flowers's testimony reflects that when he started to examine [Petitioner]'s gang affiliations, it was difficult and he initially relied upon an old photograph to determine his associates. As he continued his investigation, however, he determined [Petitioner] associated with other Weller Boys, and explained the basis for his opinion.

[Petitioner] next asserts Flowers improperly testified as to ultimate issues when he said the Weller Boys were "'recognized'" as part of Villa Posse, and Villa Posse was "'pretty widespread'" in Fresno. [Petitioner] complains Flowers failed to explain "exactly *who* recognized this" (italics in original), or why the Weller Boys were a criminal street gang just by being a part of Villa Posse. [Petitioner] further complains that Flowers addressed ultimate issues when he testified to his belief that [Petitioner] was arrested with gang members, even though Flowers admitted [Petitioner] was not with any gang members when he was actually physically arrested, but that [Petitioner] allegedly committed the underlying substantive offenses with other Weller Boys. In making this argument, [Petitioner] asserts that Flowers's testimony improperly addressed ultimate issues and "'did nothing more than inform the jury how [Flowers] believed the case should be decided,'" in violation of *Killebrew*, which prohibits an expert from testifying as to ultimate issues in gang enhancement cases.

[Petitioner]'s reliance upon *Killebrew* is misplaced. *Killebrew* involved a conspiracy to possess a handgun among gang members who were traveling in three cars. There was conflicting testimony whether the defendant was in one of three vehicles at issue. A gang expert offered admissible testimony about gang culture and psychology, but also testified about the subjective knowledge and intent of each individual in the cars, and declared that when one gang member in a car possesses a gun, every other gang member in the car knows about it and constructively possesses it. The expert went so far

21

as to testify that the occupants of one of the cars, to which no gun was ever linked, would know of the guns in the other two vehicles and would mutually possess those guns. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 652 & fn. 7.)

*Killebrew* held the expert's testimony about a specific defendant's subjective knowledge and intent was not the type of "culture and habit testimony" admissible in gang enhancement cases. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 654.)

> "Moreover, this topic is not one for which expert testimony is necessary. Testimony that a gang would expect retaliation as a result of a shooting such as occurred [in this case], that gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed, would have been admissible. Beyond that, [the expert] simply informed the jury of his belief of the suspects' knowledge and intent on the night in question, issues properly reserved to the trier of fact. [The expert's] beliefs were irrelevant. [¶] ... [¶] Since the erroneously admitted testimony provided the only evidence to support the conspiracy theory, reversal of the judgment is required." (*Killebrew*, *supra*, 103 Cal.App.4th at pp. 658-659.)

[Petitioner] contends Detective Flowers's testimony addressed his subjective knowledge and intent in violation of *Killebrew*. We first note that [Petitioner] did not raise this objection below. A similar situation existed in *People v. Gutierrez* (2002) 28 Cal.4th 1083, where the defendant argued on appeal that an expert gave impermissible opinion testimony on the ultimate issue. *Gutierrez* noted the defendant never raised that objection below, and "[a]ccordingly, the claim of error has not been preserved on appeal. [Citations.]" (*Id.* at pp. 1139-1140; see also *Valdez*, *supra*, 58 Cal.App.4th at p. 505; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1208-1209.)

As we have previously noted, [Petitioner] broadly raised ineffective assistance of counsel, in a footnote in his reply brief, as an alternative ground for any issues which his defense counsel did not raise objections. [Petitioner] fails to explain why we should diverge from the well-recognized rule that points raised for the first time in a reply brief will not ordinarily be considered. (*Reichardt v. Hoffman*, *supra*, 52 Cal.App.4th at p. 764.) In any event, [Petitioner]'s complaints about Detective Flowers's testimony are meritless. Flowers's testimony addressed the culture and habits of gangs in southwest Fresno related to motive, and not to the subjective intent and knowledge of [Petitioner] and Senegal. Although the two topics may be interrelated, most courts addressing the issue have found evidence of a similar character to be admissible. (See, e.g., *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049 ["Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime"]; *People v. Williams* (1997) 16 Cal.4th 153, 193-194 [in gang-related case, gang evidence is generally admissible if relevant to motive or identity]; *Ferraez*, *supra*, 112 Cal.App.4th at pp. 928, 930-931 [gang expert properly allowed to opine that drugs in defendant's possession were intended to be sold for benefit of or in association with gang, and that proceeds would be used to benefit gang]; *Valdez*, *supra*, 58 Cal.App.4th at pp. 507-509 [trial court properly admitted expert opinion concerning whether the defendant acted for benefit of gang]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370-1371 [expert testimony highly probative on issues of intent and motive; reasons that defendants sought out person who crossed out their graffiti and responded violently to victim yelling gang name, fell within permissible scope of expert testimony]; *People v. Gamez* (1991) 235 Cal.App.3d 957, 964, 968, fn. 3 [officers properly gave opinion that motive for shooting

was retaliation for earlier shooting] (reversed on other grounds by *Gardeley*, *supra*, 14 Cal.4th at p. 624, fn. 10); *People v. Harvey*, *supra*, 233 Cal.App.3d at pp. 1226-1229 [officer properly allowed to testify regarding significance of various activities and role of each defendant in hierarchy of Colombian cocaine distribution cell]; see also *People v. Zermeno* (1999) 21 Cal.4th 927, 929-930 [although the propriety of expert's testimony was not at issue, Supreme Court noted that expert opined the defendant mistook victim for member of rival gang and attacked in retaliation for earlier incident].)

[Petitioner] asserts Flowers's addressed his subjective intent in violation of *Killebrew* because he testified that [Petitioner] and Senegal acted to benefit the gang. [Petitioner] cites to a portion of the record where Flowers responded to the prosecutor's hypothetical question and testified that it would be unusual for a large gang gathering to occur so close to rival turf, and it would be advantageous for a rival group to take advantage of that situation. Flowers's testimony did not address the topics deemed inadmissible in *Killebrew*. Flowers, as the prosecution's gang expert, was permitted to testify about the identity and existence of certain gangs, and did not testify as to any ultimate issues. Flowers properly testified that based upon his experience as an officer and member of the MAGEC team, the Weller Boys was a street gang which consisted of 23 members, occupied the 2300 block of Weller Street, with the primary activity of narcotics sales. Flowers further explained that Villa Posse was a larger gang which consisted of numerous smaller neighborhood gangs in Fresno. Flowers's testimony on these points did not reach ultimate issues in the case.

[Petitioner] points to another area where Flowers's testimony allegedly reached ultimate issues. He argues Flowers's testimony was "so internally inconsistent and so confusing" that the jury found the gang enhancements true only because Flowers "told the jury that he believed Weller was a criminal street gang and [[Petitioner]] was a member of that criminal street gang whose subjective intent was to act for the benefit of the gang." Flowers never stated his personal opinion as to guilt or innocence or stepped into the shoes of the trier of fact. Instead, he testified that the crimes were committed for the benefit of the gang based on his knowledge of the motivations behind this crime and the conflicts between the street gangs aligned with TWAMP and MUG. Such an opinion was proper in light of the charges, and the fact that the *average* juror is not privy to the machinations in the average gangster's mind. (See *Valdez*, *supra*, 58 Cal.App.4th at pp. 507-508; 1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evidence, § 89, pp. 635-636 ["'[I]n this state we have followed the modern tendency and have refused to hold that expert opinion is inadmissible merely because it coincides with an ultimate issue of fact.' (*People v. Cole* (1956) 47 C[al].2d 99, 105, 301 P.2d 854 ... )"].)

. . . .

We thus conclude Detective Flowers's testimony was properly admitted and addressed gang culture and habits, and he did not address ultimate issues as defined in *Killebrew*. [Petitioner]'s objections go to the weight rather than the admissibility of his testimony, the jury was obliged to make these factual and credibility determinations, such determinations are not reweighed on appeal, and there is nothing in Flowers's testimony which rendered it inherently implausible or impossible of belief. The jury's findings on the gang enhancements, and the related firearm enhancement (§ 12022.53, subd. (e)), are supported by substantial evidence.

(LD 7 at 38-48.)

As stated in Claim One, *supra*, in analyzing an insufficient evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The AEDPA requires the federal court to "apply the standards of *Jackson* with an additional

23

layer of deference," and ask "whether the decision of the California Court of Appeal reflected an 'unreasonable application' of *Jackson* and *Winship* to the facts of this case." *Juan H.*, 408 F.3d at 1274-75 & n.13.

The Ninth Circuit has clarified the requirements for a gang enhancement under California law:

> First, the prosecutor must demonstrate that the defendant committed a felony "for the benefit of, at the direction of, or in association with [a] criminal street gang." Cal. Penal Code § 186.22(b)(1). Second, the prosecutor must show that the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." *Id.* We have previously recognized the importance of keeping these two requirements separate, and have emphasized that the second step is not satisfied by evidence of mere membership in a criminal street gang alone. *See Garcia v. Carey*, 395 F.3d 1099, 1102-03 & n. 5 (9th Cir. 2005).

*Briceno v. Scribner*, 555 F.3d 1069, 1078 (9th Cir. 2009). A "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more" enumerated criminal acts, "having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Cal. Penal Code § 186.22(f) (2002).[9] A "pattern of criminal gang activity" is defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" enumerated criminal offenses, "provided . . . the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." Cal. Penal Code § 186.22(e) (2002).

In *Briceno*, the court stated "that these 'detailed requirements' were designed to ensure that the statute increased punishment only when a defendant 'committed a felony to aid or abet criminal conduct *of a group* that has as a primary function the commission of specified criminal acts and whose members have actually committed specified crimes, and who acted with the specific intent to do so.'" *Id.* at 1080 (*quoting People v. Gardeley*, 14 Cal. 4th 605, 623-24 & n.10 (1997) (as modified)). The *Briceno* court stated that the California Supreme Court in "*Gardeley* suggest[ed] that merely being a gang member, or committing a crime in association with another gang member, is not enough to trigger the sentencing

---

[9] "Primary activities" is defined as "one of the group's 'chief' or 'principal' occupations. . . . That definition would necessarily exclude the occasional commission of those crimes by the group's members." *People v. Sengpadychith*, 26 Cal. 4th 316, 323 (2001).

enhancements of § 186.22(b). Rather, the defendant must commit the crime with the specific intent to aid or abet the criminal conduct of the gang." *Id.*

Here, Petitioner's allegation of insufficient evidence focuses on the first prong of the gang enhancement statute: whether he was "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang." Cal. Penal Code § 186.22(b)(1); (*see* Pet. 6; Pet. Ex. 1). Sufficient evidence supported the existence of a "criminal street gang"—the Weller Boys, part of a much larger gang, Villa Posse (VP). (3 RT 514.) Flowers stated the principal occupation of the Weller Boys was narcotics sales. (*Id.* 493.) Flowers testified that the Weller Boys had more than three individuals, a common name, and members that "individually or collectively engage in or have engaged in a pattern of criminal gang activity." (*Id.* 514; *see id.* 507.) With regard to a "pattern of criminal gang activity," Flowers testified to validated gang members of Weller Boys and/or Villa Posse convicted of statutorily enumerated offenses. (*See id.* 507-10.)

As stated by the court of appeal, there was sufficient evidence that Petitioner was a member of the Weller VP gang, based upon Petitioner's self-admission at booking and his association with other members of the Weller VP gang, as stated by Flowers. (*See* 3 RT 501-06; 4 RT 563.) There was also sufficient evidence that Senegal was a member of the Weller VP gang, similarly based on his self-admission and long-term association with other gang members, as stated by Flowers. (*See* 3 RT 498-502.) Flowers testified that both Thomas twins were members of Weller VP. (3 RT 509-10; 4 RT 532.) While Beard denied his own membership, he admitted family members were associated with the U-Boys, and Flowers testified that both Beard and McGhee were members of the U-Boys. (2 RT 200-01, 229; 3 RT 510-11.) As stated by the court of appeal, at least three Weller VPs—Petitioner, Senegal, and one of the Thomas twins—walked up to a large gathering of U-Boys—which included Beard and McGhee—drawing weapons and repeatedly firing into the group. The court of appeal stated that this act was "clearly done for the benefit of Weller VP." (LD 7 at 40.)

The Court agrees with the court of appeal's analysis. Flowers testified that Weller Boys and U-Boys were part of rival gang alliances TWAMP and MUG, respectively. (3 RT 487-88, 491.) When asked to render an opinion about the possible motivations for the shooting of Beard and McGhee, Flowers stated that the rivalry between TWAMP and MUG had been exacerbated by the killings of a

25

member from each of TWAMP and MUG. (3 RT 491-92.) Flowers testified that it would be expected that TWAMP would retaliate against MUG for killing one its members, and that the murder of McGhee and attempted murder of Beard would benefit the Weller gang by furthering the reputation of the gang. (3 RT 491-92, 511-13; 4 RT 551-52, 558.) According to Flowers, by participating in the shooting, not only would Petitioner's and Senegal's "individual status grow, but the shared status of the group would be far extended. It would send a clear message to rivals that they are a force to be reckoned with." (3 RT 513.)

Viewing the evidence in the light most favorable to the prosecution and presuming the jury resolved all conflicting inferences from the evidence against Petitioner, the Court finds that a rational trier of fact could find that Petitioner's convictions were "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" beyond a reasonable doubt. Cal. Penal Code § 186.22(b)(1); *Jackson*, 443 U.S. at 319, 326; *Walters*, 45 F.3d at 1358.[10]

Accordingly, the Court finds that the California courts' rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

### Claim Three

In his third claim, Petitioner contends his First Amendment right of association was violated because the STEP Act—containing the gang enhancement statute, California Penal Code section 186.22—punishes individuals for the unlawful acts of others. (Pet. 7; Pet. Ex. 1.) Petitioner states that he was labeled a gang member because he was in pictures with other gang members, and that because other gang members committed predicate offenses, Flowers was able to count the crimes for which

---

[10] Although Petitioner does not argue that the second prong of the gang enhancement statute—that Petitioner was convicted of a felony committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members"—has not been met with sufficient evidence, sufficient evidence does support this prong. In *Briceno*, the Ninth Circuit cited *People v. Romero*, 140 Cal. App. 4th 15 (2006), for the proposition that a jury could reasonably conclude that a defendant committed a crime with the specific intent to benefit a gang by performing a retaliatory shooting on a rival gang's turf. *Briceno*, 555 F.3d at 1081. Here, Flowers testified that TWAMP would retaliate against MUG for the killing of one of its members, and that a retaliatory killing would advance the gang's reputation and that of the shooter's. Utilizing testimony from Flowers and Ms. Nutt, the jury could reasonably conclude that Petitioner's convictions were committed with the specific intent to promote, further, or assist Weller VP and/or TWAMP when Petitioner and his associates fired upon U-Boys gang members on U-Boys turf.

Petitioner was arrested in the instant case as predicate offenses for imposition of the gang enhancement. (Pet. 7; Pet. Ex. 1.) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst*, 501 U.S. at 803-05. In rejecting Petitioner's claim, the court of appeal stated:

> [Petitioner]'s second constitutional challenge is that the STEP Act violates his First Amendment right to free association, such that he was convicted because of guilt by association with other gang members.
> "Section 186.22 has been upheld against a variety of constitutional challenges, including claims based upon the First Amendment and the due process clause of the Fourteenth. [Citations.] As these cases have explained, the carefully crafted terms of the statute ensure that mere membership in a criminal street gang will not be punished and that groups or associations whose primary purpose is not the commission of crime will be excluded from coverage. [Citations.]" (*People v. Lopez* (1998) 66 Cal.App.4th 615, 633-634.)
> [Petitioner] fails to acknowledge that the California Supreme Court has rejected the free association argument. "... [T]he STEP Act punishes *conduct*, not association." (*People v. Loeun*, *supra*, 17 Cal.4th at p. 11, italics in original; *Gardeley*, *supra*, 14 Cal.4th at pp. 623-624.) "The requisite 'pattern of criminal gang activity' is merely part of what the prosecution must prove to establish that the current crime is related to an ongoing 'criminal street gang.' [Citation.] Nothing in the statutory scheme suggests that the Legislature intended that the prosecution could prove this 'pattern' only if it could show that a defendant had knowledge of prior crimes committed by fellow gang members." (*People v. Loeun*, *supra*, 17 Cal.4th at p. 10.) "... Moreover, the STEP Act satisfies the requirements of due process by 'impos[ing] increased criminal penalties only when the criminal conduct is felonious and committed not only "for the benefit of, at the direction of, or in association with" a group that meets the specific statutory conditions of a "criminal street gang," but also with the "specific intent to promote, further, or assist in any criminal conduct by gang members." [Citation.]' [Citation.] We do not understand the due process clause to impose requirements of knowledge or specific intent beyond these, and defendant cites nothing to convince us otherwise." (*Id.* at p. 11; see also *People v. Gamez*, *supra*, 235 Cal.App.3d at pp. 969-976; *In re Alberto R.* (1991) 235 Cal.App.3d 1309, 1323-1324.)

(LD 7 at 50-51.)

——— "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." *Healy v. James*, 408 U.S. 169, 181 (1972); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). However, "[t]he freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 776 (1994); *see Villegas v. City of Gilroy*, 484 F.3d 1136, 1142 (9th Cir. 2007) ("[T]he First Amendment's freedom of association protects groups whose activities are explicitly stated

in the amendment: speaking, worshiping, and petitioning the government." (*quoting IDK, Inc. v. Clark County*, 836 F.2d 1185, 1192 (9th Cir. 1988))).

Here, Petitioner's claim is without merit. Whatever the scope of Petitioner's First Amendment right of association, it does not encompass a right to associate with active members of a criminal street gang for the purpose of engaging in crime. *Madsen*, 512 U.S. at 776. In addition, the gang enhancement statute does not penalize Petitioner for mere association, but for committing felonies "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(1); *see People v. Loeun*, 17 Cal. 4th 1, 11 (1997) ("[T]he STEP Act does not criminalize group membership. . . . [T]he STEP Act punishes *conduct*, not association."). As discussed in Claim Two, *supra*, sufficient evidence supported the jury's finding of the gang enhancement.

Accordingly, the Court finds that the California courts' rejection of Petitioner's First Amendment claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

**Claim Four**

In his fourth claim, Petitioner argues that his due process rights were violated because the STEP Act encourages arbitrary and discriminatory enforcement. (Pet. 7; Pet. Ex. 1.) Petitioner states that the STEP Act allows the prosecution to present for acceptance the theory that alliances of gangs perceived to exist by law enforcement justifies using the predicate crimes of disparate gangs against one another. (*Id.*) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst*, 501 U.S. at 803-05. In rejecting Petitioner's claim, the court of appeal stated:

> [Petitioner] contends the STEP Act is void for vagueness and unconstitutional. His argument is based on the existence of appellate cases which have interpreted and applied the STEP Act, from which he asserts that "the continuing struggle to interpret the STEP Act has resulted in increased confusion through the deletion of whatever restraints on arbitrary and discriminatory enforcement the STEP Act (arguably) originally contained." He further asserts that the "end result" of these cases "is that the STEP Act now fails" the constitutional test for vagueness.
>     "... A facial vagueness challenge is based on the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and on article I, section 7 of the California Constitution. [Citation.] Under both the federal and the state Constitutions, vagueness invalidates a criminal statute if the statute ""fail[s] to provide

28

the kind of notice that will enable ordinary people to understand what conduct it prohibits ...'" or if it "'may authorize and even encourage arbitrary and discriminatory enforcement." [Citation.]' [Citations.]" (*In re Jorge G.* (2004) 117 Cal.App.4th 931, 938.)

In *Sengpadychith*, *supra*, 26 Cal.4th 316 the California Supreme Court prefaced its opinion with the statement that it has continued to struggle, step by step, "through the thicket of statutory construction issues presented by the California Street Terrorism Enforcement and Prevention Act of 1988." (*Id.* at p. 319.) From this statement [Petitioner] argues that the California Supreme Court has had to struggle with the STEP Act, therefore persons of ordinary intelligence have struggled, and the Supreme Court's interpretations of the STEP Act come too late to enable such persons to modify their behavior and avoid the loss of liberty.

If [Petitioner]'s theory that struggles over the correct interpretation of a law result in a valid facial vagueness challenge were true, there would be very few laws that would withstand such a challenge. While the intricacies of the STEP Act have been fine tuned by case law, the law provides detailed and sufficient notice of what conduct it prohibits. In fact, although not acknowledged by [Petitioner], the California Supreme Court has held that the "detailed requirements of the STEP Act are sufficiently explicit to inform those who are subject to it what constitutes a criminal street gang for purposes of the act." (*Gardeley*, *supra*, 14 Cal.4th at p. 623.) Moreover, in *People v. Castaneda* (2000) 23 Cal.4th 743, the California Supreme Court found that the substantive crime of participation in a criminal street gang is not void for vagueness: "Through section 186.22(a)'s plainly worded requirements—criminal knowledge, willful promotion of a felony, and active participation in a criminal street gang—our Legislature has made it reasonably clear what conduct is prohibited [citation] by 'delineat[ing] the range of forbidden conduct with particularity' [citation]. And there is nothing in section 186.22(a)'s language that would encourage arbitrary or discriminatory law enforcement. [Citations]." (*Id.* at p. 752.)

[Petitioner] asserts that the case law surrounding the STEP Act has only made things worse, and criticizes holdings of the California Supreme Court and appellate opinions which have interpreted and applied the STEP Act. [Petitioner] fails to recognize that this court is bound by opinions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, we agree with the appellate opinions which have interpreted the STEP Act, and we do not believe that judicial interpretation of the STEP Act has altered it into a statute that fails to provide notice that will enable ordinary people to understand what conduct it prohibits.

(LD 7 at 48-50.)

The test for vagueness is whether the sentencing provision fails "to give a person of ordinary intelligence fair notice that it would apply to the conduct contemplated." *United States v. Rearden*, 349 F.3d 608, 614 (9th Cir. 2003); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). When determining if a statute is vague, a court should look at the common understanding of the statute's terms. *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973); *United States v. Fitzgerald*, 882 F.2d 397, 398 (9th Cir. 1989). In addition, a statute must establish minimal guidelines for law enforcement and not grant law enforcement undue discretion. *United States v. Sorenson*, 914 F.2d 173, 174 (9th Cir. 1990); *United States v. Van Hawkins*, 899 F.2d 852, 854 (9th Cir. 1990). Finally, unless First Amendment freedoms

are implicated, "a vagueness challenge may not rest on arguments that the law is vague in its hypothetical applications, but must show that the law is vague as applied to the facts of the case at hand." *United States v. Johnson*, 130 F.3d 1352, 1354 (9th Cir. 1997) (*citing Chapman v. United States*, 500 U.S. 453, 467 (1991)).

Petitioner's claim that the STEP Act, specifically the gang enhancement statute, encourages arbitrary and discriminatory enforcement and is void for vagueness is without merit. As discussed in Claim Two, *supra*, the requirements for a gang enhancement are clear:

> First, the prosecutor must demonstrate that the defendant committed a felony "for the benefit of, at the direction of, or in association with [a] criminal street gang." Cal. Penal Code § 186.22(b)(1). Second, the prosecutor must show that the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." *Id.* We have previously recognized the importance of keeping these two requirements separate, and have emphasized that *the second step is not satisfied by evidence of mere membership in a criminal street gang alone. See Garcia v. Carey*, 395 F.3d 1099, 1102-03 & n. 5 (9th Cir. 2005).

*Briceno*, 555 F.3d at 1078 (emphasis added). A "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more" enumerated criminal acts, "having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Cal. Penal Code § 186.22(f) (2002).[11] A "pattern of criminal gang activity" is defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" enumerated criminal offenses, "provided . . . the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." Cal. Penal Code § 186.22(e) (2002).

In *Briceno*, the court stated "that these 'detailed requirements' were designed to ensure that the statute increased punishment only when a defendant 'committed a felony to aid or abet criminal conduct *of a group* that has as a primary function the commission of specified criminal acts and whose members have actually committed specified crimes, and who acted with the specific intent to do so.'" *Id.* at 1080

---

[11] "Primary activities" is defined as "one of the group's 'chief' or 'principal' occupations. . . . That definition would necessarily exclude the occasional commission of those crimes by the group's members." *Sengpadychith*, 26 Cal. 4th at 323.

(*quoting Gardeley*, 14 Cal. 4th at 623-24 & n.10). The *Briceno* court stated that the California Supreme Court in "*Gardeley* suggest[ed] that merely being a gang member, or committing a crime in association with another gang member, is not enough to trigger the sentencing enhancements of § 186.22(b). Rather, the defendant must commit the crime with the specific intent to aid or abet the criminal conduct of the gang." *Id.*

These requirements are not vague, nor do they encourage arbitrary or discriminatory enforcement. California Penal Code section 186.22 specifically lists the conduct that makes a group a criminal street gang. The statute provides sufficient information to determine (1) if Petitioner was a member of a gang, (2) if Petitioner's gang's primary activity was the commission of crimes, (3) if the gang's members engaged in a pattern of criminal activity, and (4) if Petitioner's offenses were committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b), (e), (f). As discussed in Claim Two, *supra*, sufficient evidence supported the jury's finding of the gang enhancement.

Accordingly, the Court finds that the California courts' rejection of Petitioner's vagueness claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

**Claim Five**

In his fifth and final claim, Petitioner contends that his due process rights were violated when the prosecution used law enforcement officers as gang experts. (Pet. 7a; Pet. Ex. 1.) Petitioner states that (1) Flowers was not trained in sociology, psychology, or any other area of competence regarding group dynamics, (2) Flowers routinely encounters only those members of groups who attract law enforcement attention, and that (3) no anthropologist, sociologist, or group oriented psychologist would consider it reliable to make determinations based on the slanted quality of evidence law enforcement officers routinely are allowed to use. (Pet. 7a.) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst*, 501 U.S. at 803-05. In rejecting Petitioner's claim, the court of appeal stated:

In the instant case, the court properly admitted Detective Flowers's testimony as an expert on criminal street gangs. His testimony fell within the parameters of admissible evidence on the street gang enhancement. He set forth his experience investigating and contacting gang members in southwest Fresno, and testified about the existence and composition of gangs in that area. He described the Weller gang as composed of 23 individuals, with their turf on a specific block, with their primary activity as narcotics sales, it was part of Villa Posse, and both gangs were part of the TWAMP alignment. He testified about predicate crimes, and the prosecution introduced documentary evidence about those convictions. He did not address the ultimate issues of whether [Petitioner] and Senegal were guilty or innocent of the substantive offenses, or whether the gang enhancements were true. He responded to appropriate hypothetical questions, and the court instructed the jury as to the limited admissibility of his testimony on these points. We presume the jury followed the court's limiting instructions on these issues. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

On appeal, [Petitioner] raises a myriad of challenges to Detective Flowers's testimony that he failed to raise before the trial court. [Petitioner] complains that an expert is not required to assist the jury in understanding gang behavior because of "the large number of law enforcement-oriented televisions [sic] shows demonstrating the violent nature of criminal street gangs, repeated headlines and stories in the newspapers about the impact and activities of criminal street gangs and the average person's understanding of the power of fear, threats and the ability to intimidate others...." As explained *ante*, however, the jury "'need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information....' [Citation.]" (*McAlpin, supra*, 53 Cal.3d at pp. 1299-1300; *People v. Prince* (Apr. 30, 2007, S036105) __ Cal.4th __ [2007 D.A.R. 6007, 6022].) The possibility that an average person may have some general knowledge that gangs engage in criminal activity does not mean that the entirety of the subject—the specific names of local street gangs, their turf, their specific activities, their rivalries, the relationship of the suspects and victims within those gangs—is not beyond common experience to negate the need for expert testimony to assist the trier of fact.

[Petitioner] asserts that otherwise inadmissible character evidence is "laundered" through the STEP Act by expert witnesses, "magically transmogrifying evidence of the character of the group into evidence of 'motive' of the individual." [Petitioner] contends the STEP Act has been used to abrogate the traditional rules of evidence and permit law enforcement officers to testify about character evidence. As we have explained, however, the California Supreme Court has held that law enforcement officers may testify as experts in gang cases, and Detective Flowers's testimony fell within the parameters of admissibility discussed *ante*. (*People v. Hernandez, supra*, 33 Cal.4th at p. 1049.)

[Petitioner] complains that law enforcement officers are the least qualified to testify about the culture and psychology of criminal street gangs:

> "... The government agent—Ron Flowers—used in the instant case was not trained in sociology, psychology, or any other area of competence with respect to group dynamics. As a law enforcement officer, he routinely encounters only those members of groups who attract law enforcement attention. No anthropologist, sociologist, or group-oriented psychologist would consider it reliable to make determinations based on the slanted quality of evidence these law enforcement officers are routinely allowed to use." (Italics omitted.)

In his reply brief, [Petitioner] expands upon these thoughts and offers additional reasons why law enforcement officers are unqualified as experts:

32

"There is a danger of synecdoche[[12]] in the work of such officers hired by the government to investigate criminal activity. It is their job to encounter and pursue criminal elements within gangs, not to conduct anthropological or sociological research. There is an old saying that when the only tool you have is a hammer, everything begins to look like a nail. It is part of appellant's argument that the utilization of police officers as expert witnesses regarding the sociology and psychology of gangs, or the customs and habits (rightly the realm of anthropologists) of gangs, results in the introduction of evidence which would not be properly relied upon by actual experts in the field, but is typically relied upon by law enforcement officers for valid law enforcement purposes...."

[Petitioner] thus concludes that "[r]eal sociologists, psychologists, and anthropologists" (italics omitted) would not rely upon the type of information relied upon by law enforcement officers testifying as gang experts.

. . . .

In any event, in his attacks upon law enforcement officers as expert witnesses, [Petitioner] essentially requests this court to disregard the long line of cases establishing many factors relating to gangs and the STEP Act that are the proper subject of law enforcement expert testimony. (*Gardeley*, *supra*, 14 Cal.4th at p. 617; *Killebrew*, *supra*, 103 Cal.App.4th at pp. 653-658.) We decline to depart from this well-reasoned line of authority.

While declaring as a truism that experts on gangs should have specialized training in gang sociology and psychology before they are allowed to testify, [Petitioner] does not back up his statement with any references to authority requiring the experts to meet his proposed standard of qualifications. Indeed, if [Petitioner]'s specially trained experts were called to testify, we would offer the guess that their knowledge would be based primarily on information gathered and processed by law enforcement officers. We note that the information required to prove the elements of a criminal street gang under the STEP Act (an organization having three or more individuals, having as one of its primary activities the commission of criminal acts, having a common name or identifying sign or symbol, and engaging in a pattern of criminal gang activity) is precisely the type of information that is in the purview of law enforcement officers. The STEP Act itself does not require any deep delving into the social or psychological reasons for the behaviors.

[Petitioner] suggests that a police officer should not be permitted to testify as a gang expert unless the trial court conducts the type of inquiry required by *People v. Kelly* (1976) 17 Cal.3d 24, and finds the expert's proposed testimony has been generally accepted in the particular field to which it belongs. Such an argument has been rejected in other contexts. (See, e.g., *U.S. v. Hankey* (9th Cir. 2000) 203 F.3d 1160, 1169 [expert opinion on gang culture is not examined for acceptance in the scientific community, nor should it be subject to peer review], quoted with approval by *People v. Prince* (Apr. 30, 2007, S036105) __ Cal.4th __ [2007 D.A.R. 6007, 6023].)

We thus decline [Petitioner]'s invitation to ignore existing California Supreme Court authority on the admissibility of expert testimony in gang cases, and agree with other appellate courts as to the nature and extent of that testimony, and find the court herein properly permitted Detective Flowers to testify as the prosecution's expert on criminal street gangs.

(LD 7 at 34-38.)

Preliminarily, challenges to a state trial court's evidentiary rulings are not cognizable on federal

---

¹² "Synecdoche" is defined as "[a] figure of speech in which a part is used for the whole (as *hand* for *sailor*), the whole for a part (as *the law* for *police officer*)." (American Heritage Dict. (3d college ed.2000) p. 1376, italics in original.)

habeas review unless the admission or exclusion of evidence violated a petitioner's due process right to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991); *see also Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999) ("It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.").

With regard to expert testimony, the Ninth Circuit recently noted that it "found no cases 'support[ing] the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact.'" *Briceno*, 555 F.3d at 1077 (*quoting Moses v. Payne*, 543 F.3d 1090, 1105 (9th Cir. 2008)). "Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence .... an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Id.* (*quoting Moses*, 543 F.3d at 1106) (citation and internal quotation marks omitted).

Here, the trial court's allowance of Flowers' testimony as a gang expert did not violate Petitioner's due process right to a fair trial. As stated by the court of appeal, Flowers was qualified as a gang expert with his experience, and his testimony assisted the jury in determining beyond a reasonable doubt whether the gang enhancement was true. *See, e.g.*, *Briceno*, 555 F.3d at 1077-78 (finding no due process violation in gang enhancement testimony of gang investigator employed by police department). Flowers also did not opine on Petitioner's guilt or innocence.

Accordingly, the Court finds that the California courts' rejection of Petitioner's due process claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

### Certificate of Appealability

An applicant seeking to appeal a district court's dismissal of a habeas petition under 28 U.S.C. § 2254 must first obtain a certificate of appealability ("COA") from a district judge or circuit judge. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A judge should either grant the COA or state reasons why it should not issue, and the COA request should be decided by a district court in the first instance. Fed. R. App. P. 22(b)(1); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

The applicant for a COA must make a "substantial showing of the denial of a constitutional

right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). A "substantial showing" is defined as a demonstration (1) that the issues are debatable among jurists of reason; (2) that a court could resolve the issues differently; or (3) that issues are adequate to deserve encouragement to proceed further. *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for substituting the word "constitutional" for the word "federal," § 2253 codified the pre-AEDPA standard announced in *Barefoot v. Estelle*).

Where, as present here, a district court has rejected constitutional claims on their merits, the COA standard is straightforward. "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. The Court has reviewed the record of this case and finds that reasonable jurists would not find the Court's assessment of the constitutional claims debatable or wrong. On the merits of this case, reasonable jurists would not debate the constitutionality of Petitioner's conviction and sentence. Accordingly, the Court declines to issue a certificate of appealability.

## **CONCLUSION AND ORDER**

For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with prejudice and DECLINES to issue a certificate of appealability. The Clerk of Court is ORDERED to enter Judgment for Respondent and to close Case No. CV F 08-01586 LJO BAK HC.


IT IS SO ORDERED.

**Dated:    May 26, 2009**             /s/ Lawrence J. O'Neill
                                UNITED STATES DISTRICT JUDGE